Gene McNARY, Prosecuting Attorney of St. Louis County, Missouri, Respondent,

v.

Bruce CARLTON and B. Dalton Company, Appellants.

No. 58371.

Supreme Court of Missouri, En Banc.

Sept. 8, 1975.

344

John C. Danforth, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Irl B. Baris, Newmark & Baris, St. Louis, for appellants.

DONNELLY, Judge.

On February 27, 1973, the Circuit Court of St. Louis County entered its decree, under § 563.285, RSMo 1969, declaring the book "The Happy Hooker" obscene and enjoining appellants from selling or distributing it in the State of Missouri.

Section 563.285, supra, reads in part as follows:

"The circuit courts have jurisdiction to enjoin the publication, sale or distribution of obscene prints, articles and matter, as hereinafter specified: The prosecuting or circuit attorney of any county, the chief executive officer of any city, town or village or the city attorney of any city, town, or village, in which a person, firm or corporation publishes, sells or distributes or is about to sell or distribute or has in his possession with intent to sell or distribute or is about to acquire possession with intent to sell or distribute any articles or matter named in section 563.-280, or any amendment thereto, may maintain an action for an injunction against such person, firm or corporation in the circuit court of that county to prevent the sale or further sale or the distribution or further distribution or the acquisition, publication or possession within the state of such article or matter."

Section 563.280, RSMo 1969, reads as follows:

"Every person who knowingly shall manufacture, print, publish, buy, sell, offer for sale or advertise for sale, or have in his possession, with intent to sell or circulate, or who knowingly shall give away, distribute or circulate any obscene, lewd, licentious, indecent or lascivious book, pamphlet, paper, ballad, drawing lithograph, engraving, picture, photograph, model, cast, print, article or other publication of indecent, immoral or scandalous character, or shall write, print or publish, sell or circulate, any letter, handbill, card, circular, book, pamphlet, advertisement or notice of any kind giving information, directly or indirectly, when, where, how, of whom or by what means any of the things herein mentioned can

be had or obtained, and whoever shall print or publish in any newspaper any vulgar, scandalous, obscene or immoral pleadings or evidence in any case or proceeding before any court or tribunal whatever, shall, on conviction thereof, be fined not more than one thousand dollars nor less than fifty dollars, or be imprisoned not more than one year in the county jail, or both; but nothing in this section shall be construed so as to affect teaching in regular medical colleges, or public standard medical books, or reports of medical societies, or the practice of regular practitioners of medicine, or druggists in their legitimate business."

On June 21, 1973, in *Miller v. California,* 413 U.S. 15, 23–25, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419, the United States Supreme Court reformulated the constitutional test for determining obscenity, and said:

"This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment. *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); *United States v. Reidel,* 402 U.S. [351], at 354, 91 S.Ct. [1410], at 1411–1412 [28 L.Ed.2d 813]; *Roth v. United States,* supra, 354 U.S. [476], at 485, 77 S.Ct. [1304], at 1309 [1 L.Ed.2d 1498]. 'The First and Fourteenth Amendments have never been treated as absolutes [footnote omitted].' *Breard v. Alexandria,* 341 U.S. [622], at 642, 71 S.Ct. [920], at 932 [95 L.Ed. 1233], and cases cited. See *Times Film Corp. v. Chicago,* 365 U.S. 43, 47–50, 81 S.Ct. 391, 393–395, 5 L.Ed.2d 403 (1961); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. [495], at 502, 72 S.Ct. [777], at 780 [96 L.Ed. 1098]. We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. See *Interstate Circuit, Inc. v. Dallas, supra,* 390 U.S. [676], at 682–685, 88 S.Ct. [1298], at 1302–1305 [20 L.Ed.2d 225]. As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin, supra,* 408 U.S., at 230, 92 S.Ct., at 2246, quoting *Roth v. United States, supra,* 354 U.S., at 489, 77 S.Ct., at 1311; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. We do not adopt as a constitutional standard the '*utterly* without redeeming social value' test of *Memoirs v. Massachusetts,* 383 U.S. [413], at 419, 86 S.Ct. [975], at 977 [16 L.Ed.2d 1]; that concept has never commanded the adherence of more than three Justices at one time. See *supra,* [413 U.S. at 21] at 2613. If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary. See *Kois v. Wisconsin, supra,* 408 U.S., at 232, 92 S.Ct., at 2247; *Memoirs v. Massachusetts, supra,* 383 U.S., at 459–460, 86 S.Ct., at 998 (Harlan, J., dissenting); *Jacobellis v. Ohio,* 378 U.S. [184], at 204, 84 S.Ct. [1676], at 1686 [12 L.Ed.2d 793] (Harlan, J., dissenting); *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964); *Roth v. United States, supra,* 354

U.S., at 497–498, 77 S.Ct., at 1315–1316 (Harlan, J., concurring and dissenting).

"We emphasize that it is not our function to propose regulatory schemes for the States. That must await their concrete legislative efforts. It is possible, however, to give a few plain examples of what a state statute could define for regulation under part (b) of the standard announced in this opinion, *supra*:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

"Sex and nudity may not be exploited without limit by films or pictures exhibited or sold in places of public accommodation any more than live sex and nudity can be exhibited or sold without limit in such public places. At a minimum, prurient, patently offensive depiction or description of sexual conduct must have serious literary, artistic, political, or scientific value to merit First Amendment protection. See *Kois v. Wisconsin, supra,* 408 U.S., at 230–232, 92 S.Ct., at 2246–2247; *Roth v. United States, supra,* 354 U.S., at 487, 77 S.Ct., at 1310; *Thornhill v. Alabama,* 310 U.S. 88, 101–102, 60 S.Ct. 736, 743–744, 84 L.Ed. 1093 (1940). For example, medical books for the education of physicians and related personnel necessarily use graphic illustrations and descriptions of human anatomy. In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, accompanied by the safeguards that judges, rules of evidence, presumption of innocence, and other protective features provide, as we do with rape, murder, and a host of other offenses against society and its individual members."

On June 24, 1974, the United States Supreme Court handed down decisions in *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590, and *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642. In *Hamling* and *Jenkins,* the Court explained and elaborated upon the *Miller* holding. We must, of course, recognize the impact of these decisions and, where appropriate, establish procedures in Missouri which will represent meaningful compliance with their dictates.

*First,* appellants in this case are entitled to any benefits afforded by the constitutional principles enunciated in *Miller.*

■ *Second,* we may hold that § 563.280, the primary statute proscribing the dissemination of obscene material in Missouri, is not unconstitutionally vague only if we are prepared to construe the words "obscene," "lewd," "licentious," "indecent," "lascivious," "vulgar," "scandalous," and "immoral" (all of which appear in § 563.280) "as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller v. California,* supra, 413 U.S., at 25, 93 S.Ct. [2607], at 2615 * * *." *United States v. 12 200-Foot Reels of Film,* 413 U.S. 123, 130, 93 S.Ct. 2665, 2670, 37 L.Ed.2d 500. Accordingly, we now so construe § 563.280, and hold that the terms, supra, which appear therein, limit regulated material to "representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," and "representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." We assume our General Assembly could amend § 563.280 and define for regulation specific "hard core" conduct other than the examples given in *Miller.* However, until such action is taken, finders of fact at trial, and appellate courts on review, must be limited to the *Miller* examples in determining the question of patent offensiveness.

*Third,* in considering application of the "contemporary community standards" guideline, we must note the following language from *Hamling v. United States,* 418 U.S. 87, at 104 and 105, 94 S.Ct. 2887, 2900, 41 L.Ed.2d 590:

"Paradoxically, however, petitioners also contend that in order to avoid serious constitutional questions the standards in federal obscenity prosecutions *must* be national ones, relying on *Manual Enterprises, Inc. v. Day,* 370 U.S. 478, 488, 82 S.Ct. 1432, 1437, 8 L.Ed.2d 639 (1962) (opinion of Harlan, J.), and *United States v. Palladino,* 490 F.2d 499 (CA1 1974). Petitioners assert that our decisions in the two federal obscenity cases decided with *Miller* indicate that this Court has not definitively decided whether the Constitution requires the use of nationwide standards in federal obscenity prosecutions.

"We think that both of these contentions evidence a misunderstanding of our *Miller* holdings. *Miller* rejected the view that the First and Fourteenth Amendments require that the proscription of obscenity be based on uniform nationwide standards of what is obscene, describing such standards as 'hypothetical and unascertainable,' 413 U.S., at 31, 93 S.Ct., at 2619. But in so doing the Court did not require as a constitutional matter the substitution of some smaller geographical area into the same sort of formula; the test was stated in terms of the understanding of 'the average person, applying contemporary community standards.' 413 U.S., at 24, 93 S.Ct., at 2615. When this approach is coupled with the reaffirmation in *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 56, 93 S.Ct. 2628, 2634, 37 L.Ed.2d 446 (1973) of the rule that the prosecution need not as a matter of constitutional law produce 'expert' witnesses to testify as to the obscenity of the materials, the import of the quoted language from *Miller* becomes clear. A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law. *Stone v. New York, Chicago & St.*

*Louis R. Co.,* 344 U.S. 407, 409, 73 S.Ct. 358, 359, 97 L.Ed. 441 (1953); *Schulz v. Pennsylvania R. Co.,* 350 U.S. 523, 525–526, 76 S.Ct. 608, 609–610, 100 L.Ed. 668 (1956). Our holding in *Miller* that California could constitutionally proscribe obscenity in terms of a 'statewide' standard did not mean that any such precise geographic area is required as a matter of constitutional law.

\*     \*     \*     \*     \*     \*

"The result of the *Miller* cases, therefore, as a matter of constitutional law and federal statutory construction, is to permit a juror sitting in obscenity cases to draw on knowledge of the community or vicinage from which he comes in deciding what conclusion 'the average person, applying contemporary community standards' would reach in a given case."

▐ Of course, *Hamling* involved a federal prosecution. However, we consider the above language extremely significant here. The emphasis which *Miller* and *Hamling* place on the *unique* qualifications of *jurors* to apply the "contemporary community standards" guideline, raises a practical question in this suit for injunctive relief under § 563.285. Jurors are not ordinarily involved in injunction proceedings. On the other hand, trial judges do not ordinarily act as fact-finders as to the propensities of a "reasonable" person in tort law. In "obscenity" cases, we believe we should "rely on the jury system" (413 U.S., at 26, 93 S.Ct. 2607), and require that jurors be involved as triers of fact under the *Miller* guidelines. The imposition of such requirement by this Court means that it will be "constitutionally permissible to permit juries to rely on the understanding of the community from which they came as to contemporary community standards     \*     \*." 418 U.S., at 157, 94 S.Ct., at 2753. In our opinion, the diverse attitudes and desires of different communities in Missouri demand such a result. We doubt that residents in St. Louis County would view a question of obscenity in the same light as residents of

Dade County. We consider it important, in determining issues of obscenity, that neither be bound by the other. The residents of each should be accorded the privilege, by utilization of the jury system and within the *Miller* guidelines, of determining for themselves what material would be considered obscene by the average person in their communities.

*Fourth*, in *Jenkins* the Court reaffirmed that application of the *Miller* guidelines involves "essentially questions of fact," properly determined by juries, *but* then said (418 U.S., at 160, 94 S.Ct., at 2755):

"But all of this does not lead us to agree with the Supreme Court of Georgia's apparent conclusion that the jury's verdict against appellant virtually precluded all further appellate review of appellant's assertion that his exhibition of the film was protected by the First and Fourteenth Amendments. Even though questions of appeal to the 'prurient interest' or of patent offensiveness are 'essentially questions of fact,' it would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is 'patently offensive.' Not only did we there say that 'the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary,' 413 U.S., at 25, 93 S.Ct, at 2615, but we made it plain that under that holding 'no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive "hard core" sexual conduct . . . .' 413 U.S. at 27, 93 S.Ct., at 2616."

In our opinion, the requirements of *Miller* and *Jenkins* may be met, in a suit brought under § 563.285, by proceeding as follows:

■ (1) The trial court should direct the obscenity issue or issues to be made (Rule 71.03) and should order them tried with an advisory jury (Rule 73.01). After taking evidence, the trial court should instruct the advisory jury under the *Miller* requirements and should accept a special verdict on the question of obscenity if three-fourths of the members of the advisory jury concur in the verdict. (Mo.Const. Art. I, § 22(a)).

(2) If the verdict of the advisory jury is that the materials *are not* obscene, the trial court should be concluded by the verdict of the jury and should deny injunctive relief. If the verdict of the advisory jury is that the materials *are* obscene, the trial court must independently determine the constitutional question of whether the "materials depict or describe patently offensive 'hard core' sexual conduct * * *." 413 U.S., at 27, 93 S.Ct., at 2616.

(3) On appeal, the appellate court must also "conduct an independent review of constitutional claims when necessary." 413 U.S., at 25, 93 S.Ct., at 2615.

■ We have read "The Happy Hooker," and conclude that the book *could,* as a matter of constitutional law, be found to: (1) appeal to the prurient interest in sex, (2) portray sexual conduct in a patently offensive way, and (3) be without serious literary, artistic, political or scientific value. However, we reverse and remand the case so that a jury determination of the issue of obscenity may be obtained.

MORGAN, J., concurs.

HENLEY, J., concurs in separate concurring opinion filed.

FINCH, J., concurs and concurs in separate concurring opinion of HENLEY, J.

SEILER, C. J., dissents and concurs in result in separate opinion filed.

HOLMAN, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents.

HENLEY, Judge (concurring).

I recognize the validity of the points made in the dissenting opinion of Holman, J., but believe that the principal opinion follows, as it should, the suggestions made and the direction set in this troubled area by the Supreme Court of the United States in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419; *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590; and *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642. Hence, I concur.

SEILER, Chief Justice (dissenting and concurring in result).

I respectfully dissent. I would reverse outright. As I attempted to point out in my dissent in *Kansas City v. O'Connor,* 510 S.W.2d 689, 698 (Mo. banc 1974), we have a strong freedom of speech clause in our Missouri Constitution, Art. I, Sec. 8. It provides: "That no law shall be passed impairing the freedom of speech, no matter by what means communicated; that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty . . ."

As I said in the *O'Connor* case, supra, "The spirit of this clause of our constitution is that all speech is protected until the freedom is abused—that is, unless the speech infringes on the rights of others." I fail to see where this book in any way infringes on the rights of others. Merely because the United States Supreme Court might find "The Happy Hooker" to be obscene does not mean that we have to follow suit. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). The freedom of speech clause in the Missouri constitution (which we, of course are sworn to uphold) straightforwardly tells us that we must protect the freedom of speech, the right of every person to write whatever he will on any subject. We should do so in this case and dissolve this injunction.

In the period of time I have been on the court, I do not recall any case where we have failed to hold that the material before us was obscene. We usually do this by using tests formulated by the United States Supreme Court as to what can constitutionally be forbidden under the First Amendment. We approach it as though the limits beyond which we cannot go are the limits to which we must go.

In my opinion this is not a workable approach and we do not need to inflict it upon ourselves. Our own opinions describe the course chartered by the United States Supreme Court in what Judge Henley refers to as "this troubled area" as having "created uncertainty", *S. S. & W., Inc. v. Kansas City,* 515 S.W.2d 487, 490 (Mo.1974). In my judgment, the only workable solution is to abide by the provisions of our own constitution that "every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject", leaving it to the good sense of the Missouri public whether or not to read or purchase a particular book, so long as the author or publisher does not abuse the liberty guaranteed by our constitution by attempting to impose "The Happy Hooker", for example, on those who do not want it, or advertising it in an offensive way or offering it to children (there is no evidence of any such abuse in this case).

If we have accomplished anything constructive by the rigid way we have dealt with obscenity cases I fail to see it. Certainly we have not lessened publication and sale of the class of books of which "The Happy Hooker" is an example. If anyone doubts this, let him go to any news or bookstand in any town of size in Missouri and see for himself. And, in fact, the book before us, "The Happy Hooker" has now been made into a motion picture.

But to return to the federal criteria referred to in the principal opinion, the book under consideration is more than a series of stark sexual encounters. As stated in one of the book reviews in evidence in the trial:

"After sorting through the beds, hotels, and naked bodies, one realizes that the book is nothing more than an appeal to legalize prostitution". This is a critical fact. The book, taken as a whole, does have some "serious literary, artistic, political or scientific value". This brings it under the protection of the First Amendment, according to *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). "The Happy Hooker" provides a source of information about an underside of our society and it seriously makes an argument for the legalization of prostitution and abolition of victimless crimes. Social studies can make use of this kind of an account. The book, as a whole, does provide some insight into who becomes a prostitute, why, who utilizes the services of prostitutes and how the system works. Regardless of one's views as to legalization of prostitution it must be recognized as a live question. The Section on Individual Rights and Responsibilities of the American Bar Association has adopted a resolution urging repeal of prostitution laws. Constitutional freedom of speech provisions protect contributions to legitimate discussions of the reshaping of our society. They operate to protect this book from a decree ordering it destroyed.

Finally, while I believe this case should be reversed outright, it can at least be said for the method used here—injunctive relief under Sec. 563.285 RSMo 1969—that it operates prospectively and does not subject an individual to criminal penalties for conduct relating to material which he has no way of knowing will be considered obscene until after the members of this court have decided how it strikes them individually. If the case is not to be reversed outright, then I would concur in the result reached in the principal opinion of reversing and remanding for a new trial.

HOLMAN, Judge (dissenting).

I respectfully dissent.

The calling of an advisory jury in an equity case is a matter within the trial court's discretion. *McCullough v. McCullough,* 31 Mo. 226 (1860). And when such a jury is used, its verdict is not binding on the court. We have stated that "Equity cases are rarely tried to a jury. And in those rare instances where an issue is submitted to a jury the verdict is advisory only. The court may accept or reject the verdict and, if accepted, it is the court's own finding on the fact issue rather than that of the jury." *Edwards v. Maples,* 388 S.W.2d 850, 852 (Mo.1965). Contrary to the foregoing, the principal opinion holds that an advisory jury must be called by the trial court in this type of case and if the verdict is that the materials are not obscene the trial court is bound thereby. I do not believe that such procedure is either permissible or sound under settled equitable principles.

In accord with the well established decisions Rule 84.13(b) provides that: "No appellate court shall reverse any judgment, unless it finds that error was committed by the trial court against the appellant, materially affecting the merits of the action." It is conceded by the principal opinion that the trial court did not err in failing to call an advisory jury in the trial of this case. We are therefore precluded by the quoted rule from reversing this judgment upon the ground that no jury was called.

I would affirm the judgment in this case.